In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1753

ALICE L. GEDATUS,

*Plaintiff-Appellant,*

*v.*

ANDREW M. SAUL,
Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 19-cv-203-bbc — **Barbara B. Crabb**, *Judge.*

ARGUED JANUARY 21, 2021 — DECIDED APRIL 23, 2021

Before SYKES, *Chief Judge*, and MANION and ST. EVE, *Circuit Judges*.

MANION, *Circuit Judge*. Alice Gedatus seeks social security disability benefits. She alleged many medical conditions, including lumbar degenerative disc disease, sciatica, leg pain, knee pain, wrist difficulties, tremors, and residual effects from a head hemorrhage. Over the years, she underwent multiple surgeries and other treatments. After a hearing, the

Administrative Law Judge agreed with Gedatus about several issues, but concluded she could perform light work with some limits, so she was not disabled. No doctor opined she needed more limits than the ALJ determined. The district judge affirmed. Gedatus appeals, raising myriad errors collected in two clusters. First, she argues errors permeate the ALJ's symptom evaluation. Second, she argues the ALJ erred by not setting forth an assessment of her limited sitting tolerance or tremors. We conclude substantial evidence supports the ALJ's decision, and the ALJ did not otherwise reversibly err. So we affirm.

## I. Medical history

Gedatus was born in 1976. She graduated from high school. By 2003, she worked at a bar. In 2009, she had lumbar fusion surgery for ongoing back pain. In 2010, she suffered a subarachnoid hemorrhage and spent over two weeks in a hospital. She testified vividly about the onset: "I was actually at work and … it was like someone hit me in the head with an axe all of a sudden. And I could tell people were talking to me, but I couldn't understand what they were saying." An angiogram showed an aneurysm. She had various medical procedures at different times, including coil embolization and verapamil injections. An exam in the hospital on May 25, 2010, found tremors and loss of strength in her extremities; clonus (involuntary muscle contractions); abnormal reflexes; impaired gait, mobility, and balance; and possible cognitive impairment. She could sit for 15 minutes. She was discharged on May 28, 2010, with limitations: no driving, no lifting over 10 pounds, and no repetitive bending or lifting. She eventually received a walker.

In 2012, she injured her right foot. She complained about foot pain, "some disability," decreased energy, and limping. In January 2013, she continued to complain of right foot and ankle pain. A doctor diagnosed tendonitis and put her in a boot. The pain and tendonitis continued into February. The doctor switched her to an ankle brace and prescribed Medrol Dosepak. In March, medical records indicate she continued complaining of back and foot pain. She underwent a lumbar MRI on March 19, 2013, that different doctors interpreted differently. We will discuss that in detail below.

Her back and foot problems continued into April. She complained of 8/10 back pain, and said it prevented her from sitting more than 30 minutes. The doctor advised her to use a cane, avoid limping, and undergo more physical therapy. She complied with physical therapy and other treatments, but her back and foot problems continued. Records from July document continued lower back pain and bilateral foot pain despite pain medications and physical therapy. Her medications included Neurontin, Gabapentin, and Tramadol. Records from October reflect continued back pain, with an inability to sit more than 30 minutes, stand more than an hour, or walk more than a mile. Records from November reflect ongoing foot pain. She continued to work despite the pain.

A spine specialist examined her in November 2013. She complained of pain in her low back, right hip, buttock, and right leg. Lumbar x-rays showed instability and degenerative changes. The doctor re-read a March 2013 MRI and found a disc herniation which he said was missed earlier. He recommended an epidural steroid injection and more physical therapy. She continued suffering and treating through 2013 and

into 2014. Multiple doctors concluded her back pain might relate to the hardware installed during the fusion in 2009.

Records show continued back and foot pain through 2014, despite injections, other medications, various assistive devices, physical therapy, and other treatment. Back pain continued in 2015. She also suffered right hand pain and weakness, leg tremors, and balance difficulties. She saw a neurologist in July 2015, who noted the aneurysm effects included memory issues, difficulty focusing, and arm tremors correlated with increasing back pain. He also documented clonus-like movements, muscle weakness and tightness, and a positive Hoover's sign bilaterally (indicating leg weakness). Leg tremors persisted through 2015. Medical providers disagreed over whether her anxiety contributed to her tremors.

In 2016, she reported right knee pain and related problems. She was diagnosed with a meniscus tear. Over the year, her back pain, right wrist pain, leg tremors, right knee swelling, bilateral hip weakness, quadriceps weakness, and easy fatiguability continued, despite medication and other treatment. In 2017, she presented with right wrist pain. The doctor diagnosed a complex cartilage tear and applied a cast. She participated in further physical therapy for her back. The records show bilateral hip weakness and difficulty with prolonged sitting, standing, and walking.

## II. Procedural history

On March 31, 2015, Gedatus applied for disability insurance benefits. She alleged a disability onset date of May 11, 2010. State-agency physician Dr. Chan reviewed the record. In July 2015, he opined she had the physical, sustained,

maximum residual functional capacity to perform light work,[1] with limitations: only occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand and/or walk for 6 of 8 hours in a workday; sit for 6 of 8 hours in a workday; frequently stoop. Dr. Chan opined she could climb, balance, kneel, crouch, and crawl throughout the workday without limitation. State-agency physician Dr. Khorshidi also reviewed the record and reached similar conclusions in November 2015, except she limited climbing and balancing to frequently and she imposed no limitation on stooping. In November 2015, Russell Phillips, Ph.D., opined Gedatus had no medically determinable mental impairment. Gedatus did not provide any Medical Source Statement from any physician.

The ALJ held a hearing on February 20, 2018. Gedatus testified she returned to bartending after the 2009 fusion, but was fired because she could no longer do certain tasks. She testified about her brain aneurysm, surgery, and hospitalization. She suffered residual difficulties, including shaking legs, a loss of balance, memory problems, and difficulty learning new information. She also continued to suffer back and hip problems which pre-existed the aneurysm, and she developed anxiety and depression. She returned to bartending part-time in 2012, but she could not fulfill the job duties so she was taken off the schedule. About

---

[1] The Regulations define "Light work": "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). The Department of Labor's Dictionary of Occupational Titles defines "Light Work" similarly, but with some nuances.

a year later, she bartended during slow shifts for 10 to 15 hours per week. She testified she would work one day and then recover over the next two days. Her back, hip, legs, and feet prevented her from working full-time. She also testified about knee swelling and wrist tendonitis. Her pain persisted despite various treatments, including surgery, physical therapy, home exercises, kinetic tape, and medications.

She testified she had difficulty performing household tasks. She said she was limited to sitting for 20 to 30 minutes at a time, and was limited to standing for 20 to 30 minutes at a time. She admitted she did not have to stop at all during the car ride of about 1 hour from her home to the hearing. But the ALJ was quick to point out that if she sat in the passenger side she could "kind of move about." She agreed. The ALJ also noted she moved in her chair during the hearing. He asked her about the location of most of her current pain. She said it was all in her back, mostly on the right side and in the middle. She said she could lift 15 to 20 pounds occasionally.

A vocational expert testified. The ALJ had him assume an individual of the same age, education, and work experience as Gedatus. The ALJ said, "I'm going to find that the individual" could work at a light exertional level; but could only stand and walk for about 4 of 8 hours; could only sit for 6 of 8 hours with normal breaks; could only occasionally climb ramps and stairs; could only occasionally balance and stoop; could not kneel, crouch, or crawl; and must avoid unprotected heights. The vocational expert said such an individual could not work as a bartender but could perform other jobs in the national economy at the light level, unskilled, including office clerk, counter clerk, and information clerk. He said severe mental impairment with depression would not alter his

conclusion. He said that if this individual had to stay off task for more than 15% of the workday, then no jobs would be available. He said that if the individual were limited to only occasional use of the right hand, then the office clerk position would be out. He said that if the individual had to elevate her legs above waist height for 20 minutes, 3 times per workday, in addition to normal breaks, then no jobs would be available.

The ALJ determined Gedatus was not disabled, and denied benefits. The Appeals Council denied review, leaving the ALJ's decision as the final decision of the Commissioner of Social Security. Gedatus appealed to the district court, which affirmed. She now appeals to us.

### III. ALJ's decision

To be considered disabled, Gedatus had to prove she was unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last at least 12 straight months. 42 U.S.C. § 1382c(a)(3). The regulations set out a 5-step sequential inquiry to determine disability status. The ALJ must decide (1) whether the claimant is currently employed; (2) whether she has a severe impairment or a combination of impairments that is severe; (3) whether her impairments meet or equal any impairments listed as conclusively disabling; (4) whether she can perform her past work; and (5) whether she is capable of performing any work in the national economy. 20 C.F.R. § 404.1520(a)–(g). If she is not currently employed and has a severe impairment (or combination) meeting the conclusively disabling impairments, then she is disabled. Or, if she is not currently employed, has a severe impairment (or combination), and cannot perform her past work or any other work in

the national economy given her limited residual functional capacity, then she is disabled. The claimant bears the burden of proof at each step except 5, when the burden shifts to the Commissioner.

Here, the ALJ found she had not engaged in substantial gainful activity since the alleged onset date of May 11, 2010. So she satisfied step 1.

At step 2, the ALJ found she had these severe impairments: status-post lumbar spine fusion with continuing pain and loss of range of motion, right knee degenerative joint disease, bilateral foot pain with spurring and history of Achilleus tendon tear. The ALJ determined that these severe impairments significantly limit her ability to perform basic work activities.

On the brain aneurysm, the ALJ determined: "The medical evidence establishes findings of status-post brain aneurysm reportedly controlled." He determined this impairment had no more than a minimal effect on her ability to work, so it was not severe. Likewise for depression. (On appeal, she does not challenge the ALJ's findings on mental issues.) Regarding the leg tremors, the ALJ bemoaned the lack of objective medical evidence about their intensity, persistence, and effect on work. He determined that without this evidence, he could not decide whether the leg tremors were disabling, so he found them not to be impairments or related to other impairments. (Remember, she had the burden of proof at this step.)

At step 3, the ALJ determined her impairments (singularly and in combination) did not meet or equal the severity of any listed impairments. She does not challenge this on appeal.

The ALJ determined she had the residual functional capacity to perform light work with these limitations: no standing

or walking for 4 or more hours out of 8; no kneeling, crouching, crawling, or climbing ladders, ropes, or scaffolds; only occasional balancing, stooping, and climbing ramps and stairs; and avoid unprotected heights. In his written decision, the ALJ did not expressly limit sitting beyond the limitation to light work. At the hearing, however, the ALJ seemed to find, or to say he would find, that Gedatus could not sit more than 6 of 8 hours (with normal breaks).

The ALJ considered the evidence and explained his reasoning. He concluded that her medically determinable impairments could reasonably be expected to cause the symptoms she alleged. But he also concluded that "her statements concerning their intensity, persistence and limiting effects are not entirely consistent with the medical evidence and other evidence for the reasons explained in this decision."

The ALJ recited her medical history, highlighting moments when she subjectively complained of pain and moments when the objective evidence was minimal or negative. The ALJ noted she had a "successful" lumbar spine fusion and physical therapy with "normal signs," including x-rays in 2009. (All quotes in this paragraph and the next are the ALJ's words, based on the evidence.) She complained in October 2012 of right foot pain, but a doctor "found only ankle tenderness." Another doctor diagnosed Achilleus tendinitis and prescribed a boot in January 2013. This doctor found "no defects but tibial tenderness" and replaced the boot with a brace the next month. In April 2013, she complained of 8/10 back pain, and a doctor found mechanical overload "but full strength and motion." An MRI[2] was "normal." In October

---

[2] It is fair to presume the ALJ is talking about the March 19, 2013 MRI.

2013, she complained of foot problems, but x-rays were negative. Diagnosis: just a contusion. In January 2014, she had normal strength and motion but she still wanted a specialist referral. An orthopaedic doctor found her in "only mild distress with intact strength, sensation, and straight-leg raise."

In May 2014, she reported back pain but had "normal signs." In October 2014, she complained of back and right heel pain but the findings "were largely unremarkable." In July 2015, she sought treatment for leg tremors. The doctor found "unremarkable signs but suggested they were positional or clonus." An EMG produced "normal findings." A lumbar spine MRI was also "normal." In January 2016, she complained of right knee pain, but x-rays were negative. A doctor found she had "full motion, strength, and neurological signs with no atrophy, crepitus, or instability." An MRI was negative. She "improved" with therapy. In November 2017, she assessed herself as having no depression or anxiety.

The ALJ also reviewed the opinions of the state-agency physicians. These physicians determined in July and November 2015 that she "demonstrate[d] the maximum sustained work capability" for "LIGHT" work. In November 2015, a state-agency physician rated her limitations in climbing and balancing as "Frequently." The ALJ noted that although he recognized other restrictions, he gave great weight to the opinions of the state-agency physicians because they were supported by the record, including Gedatus's own report and testimony of being able to lift 20 pounds.

Regarding potential mental impairments, the ALJ noted that he gave "some weight" to the state-agency psychologist's opinion that Gedatus had *no* mental impairments. But the ALJ also considered the "record of prescribed medication and the

claimant's report it was a low dosage with no significant limitations alleged." The ALJ found this supported a finding of non-severe impairments.

The ALJ determined Gedatus was unable to perform her past relevant work. But he concluded—given her age, education, work experience, residual functional capacity, and a vocational expert's opinions—that she could perform some other jobs existing in significant numbers in the national economy. So the ALJ concluded she was "not disabled."

## IV. Analysis

We review the district judge's decision *de novo*, without deference. But we apply a deferential standard to the ALJ's decision. We will reverse an ALJ's decision denying benefits only if it is not supported by substantial evidence or if it is the result of an error of law. 42 U.S.C. § 405(g); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

We will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination so long as substantial evidence supports it. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). We review the ALJ's decision to determine whether it reflects an adequate logical bridge from the evidence to the conclusions. *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). We will "reverse only if the record compels a contrary

result." *Borovsky v. Holder*, 612 F.3d 917, 921 (7th Cir. 2010) (internal quotation marks and citation omitted).

Gedatus raises two basic issues on appeal. She challenges the ALJ's symptom evaluation for a plethora of "legal and factual errors permeating the ALJ's decision." And she argues he erred by failing to give an evaluation of her limited sitting tolerance or tremors, in violation of Social Security Ruling 96-8p.

**1. Subjective symptoms**

The ALJ found Gedatus's statements about her symptoms to be "not entirely consistent with the medical evidence and other evidence for the reasons explained in this decision." She criticizes the ALJ for applying the wrong standard. She argues the language "are not entirely consistent" means the ALJ required the evidence to be entirely consistent with her claims about her symptoms before he would accept her claims, and did not use the appropriate preponderance-of-the-evidence standard. But we do not read the ALJ's language that way. It is clear to us, given the context, that the ALJ merely used a polite way to say the weight of the evidence did not support all her claims.

She argues that after this "boilerplate," the ALJ partially summarized only the medical evidence before concluding she is not disabled. She argues we cannot uphold an ALJ's decision when it uses boilerplate without specifying the reasons for discounting symptoms. She is right that mere boilerplate cannot support an ALJ's decision. Instead, the ALJ must set forth "specific reasons" for discounting subjective reports of symptoms. *Steele v. Barnhart*, 290 F.3d 936, 941–42 (7th Cir. 2002). But the ALJ did not rely on mere boilerplate, as Gedatus acknowledges. Rather, the ALJ explained his reasoning. He

considered and narrated her medical past at length, as well as her testimony and the state-agency physicians' opinions.

She complains that after the boilerplate, "the ALJ then partially summarized only the medical evidence before concluding Ms. Gedatus was not disabled." But if she is complaining that the ALJ summarized the medical evidence, that is unavailing because summaries are appropriate. *See Schomas v. Colvin*, 732 F.3d 702, 703 (7th Cir. 2013) ("The evidence before the ALJ includes extensive documentation of [claimant's] post-injury medical treatment, which we summarize."). And if she is complaining that the ALJ's summary was a partial summary of select evidence, that is equally unavailing because all summaries must be partial and selective. *See Herrmann v. Cencom Cable Assocs., Inc.*, 978 F.2d 978, 983 (7th Cir. 1992) ("no document can include every detail and remain a summary"). As noted above, the ALJ marked his summary with signs of hope and good health from the record. He said the 2009 fusion was "successful." She complained of right foot pain in 2012, but her doctor found "only" ankle tenderness. Another doctor found "no defects" but tibial tenderness. When she complained of back pain in 2013, a doctor found mechanical overload "but full strength and motion," and an MRI was "normal." *Et cetera*.

True, the ALJ's summary does not mention every detail. But it need not. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) ("The ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and his conclusions."). And true, the record contains evidence that could be construed as favorable to Gedatus. But the ALJ noted some of that evidence and sided with her to a degree by determining she had severe

impairments and needed some limitations on even "light" duties. This is not a case where an ALJ ignored evidence contrary to his conclusion. Despite her colorable arguments, we will not reweigh the evidence. She has not shown any reason to think the ALJ's summary or determinations are not supported by substantial evidence. Her "needless nitpicking"—the Commissioner's phrase—does not shake the conclusion that substantial evidence supports the ALJ's determination.

For example, Gedatus argues the ALJ characterized the 2013 MRI findings as "normal" when they were not normal, but showed degeneration and a small disc herniation. This issue involves different interpretations of the same MRI taken March 19, 2013. We will discuss these different interpretations in detail and demonstrate that the ALJ committed no reversible error on this point. Dr. Bartie operated in 2009. Both Gedatus and Dr. Bartie then noted significant improvements. P.A. Simpson ordered a lumbar MRI, which occurred on March 19, 2013. Dr. Jackson interpreted the results the same day. He noted mild facet hypertrophy at several levels. On L4-5, he wrote: "Disc signal and height are maintained. Moderate facet hypertrophy. No stenosis." He concluded the MRI showed a solid fusion at L5-S1, minor degenerative changes, and no compression of neural elements. Dr. Bartie then saw her on April 2, 2013. He noted that this recent MRI was "negative," that it showed "her proximal spine is well preserved," and that it showed "no degenerative change of significance in the disks or in the facet joints."

Dr. Buttermann saw her on November 11, 2013. He noted that the March 2013 MRI showed "dehydration at L4-5, the level above a solid fusion at L5-S1." He also noted "mild degenerative spondylolisthesis" and "mild right broad-based

disc herniation." Dr. Buttermann challenged the radiologist who read the MRI before (apparently Dr. Jackson). Dr. Buttermann wrote: "Interestingly, the radiologist missed these findings. He read L4-5 as being normal. The MRI scan will need to be re-read." Dr. Buttermann also opined that the instrumentation placed at L5-S1 during the surgery was "very large, and nowadays it would be considered historic in nature as it is no longer used. … Ultimately this will need to be removed." The next day, November 12, 2013, Dr. Jackson apparently wrote an addendum: "There is moderate facet hypertrophy bilaterally, with slight fluid on the left. No other significant degenerative change." The addendum does not specify the exact location of the moderate facet hypertrophy, and it is unclear on the face of the addendum whether this is the same issue Dr. Jackson noted in his original report regarding L4-5.[3]

Dr. Saeger saw her on December 2, 2013. He wrote: "There is mild degenerative spondylolisthesis right above the fusion as well as a right broad-based disc herniation which was unappreciated by the radiologist who read that level as being normal." It is unclear from the face of this record whether Dr. Saeger merely reiterated Dr. Buttermann's assessment.

Dr. Thomas saw her on February 17, 2014. His records recount her history of an L5-S1 fusion in 2009 by Dr. Bartie. A March 2013 MRI was "unremarkable"—Dr. Thomas's summary of Dr. Jackson's and Dr. Bartie's conclusion, apparently. She presented to Dr. Buttermann for a second opinion. Dr. Thomas noted Dr. Buttermann "felt that the MRI was misread and she had degenerative disc disease at L4-5 and that the

---

[3] Any ambiguity on the addendum's author does not alter our conclusion.

hardware was prominent leading to her pain." Dr. Thomas reviewed the studies himself, including the 2013 MRI, apparently. Dr. Thomas noted he was not sure what Dr. Buttermann meant about the size of the screws. Dr. Thomas thought they were standard. He noted the disc space height at L4-5 seemed to be "well maintained" with some compression on flexion but without any "obvious slip." He noted he did not see any significant facet arthropathy or stenosis. He concluded he did not see any significant disc degenerative disease at L4-5, and he did not think there was any significant instability there.

Gedatus makes much of the ALJ's summary of the 2013 MRI as "normal." But even if the various readings are mutually exclusive, and even if the ALJ gave more weight to one over the other, that was not erroneous. We will not reweigh the evidence. We are not convinced Dr. Buttermann was so clearly right about any relevant issues of disagreement as to justify disturbing the ALJ's scales. Dr. Buttermann's conclusions do not mirror the prior readings, the subsequent addendum, or Dr. Thomas's subsequent review. Moreover, the conclusions of Dr. Bartie, Dr. Jackson, and Dr. Thomas about the 2013 MRI are at least arguably validated by a subsequent lumbar MRI on September 25, 2015. Dr. Ruzek read this MRI as showing normal results at L4-5: "Normal disc height and signal. No herniation. No facet arthropathy. No spinal canal stenosis. No right neural foraminal stenosis. No left neural foraminal stenosis." The ALJ correctly noted that this 2015 MRI was normal. So even if there is some evidence that the 2013 MRI was not normal in the relevant respects, there is also substantial evidence that it was, and, in any event, substantial evidence that any abnormalities the 2013 MRI might have shown did not disable Gedatus for social security purposes. And that is all we require to affirm.

Besides, the ALJ *did* determine she had severe back impairments and *did* allot her limits. Moreover, Dr. Chan and Dr. Khorshidi evaluated the 2013 MRI and concluded she could perform more Herculean work than the ALJ allowed. And she did not offer any opinion from her doctors that her lumbar spine disabled her. *See Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) (concluding ALJ could rely on state-agency doctors, and "[m]ore importantly, there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ").

Gedatus also faults the ALJ for wholly failing to evaluate the other regulatory factors from 20 C.F.R. § 404.1529(c)(3) despite evidence of her limited daily activities, strong pain medication, adverse side effects, persistent pursuit of other treatments, consistently reported aggravating factors, and a supportive work history. But she is wrong. The ALJ acknowledged and considered the relevant evidence.

Factor (i) is "Your daily activities." 20 C.F.R. § 404.1529(c)(3)(i). Contrary to her claim, the ALJ analyzed this. He observed that she did chores, shopped, handled finances, drove, read, attended events, ran errands, visited family and friends, watched television, managed a household, cared for herself and her children, and gardened. She argues the ALJ only discussed these activities to determine whether she had a severe mental impairment, but not to assess physical symptoms. But the point remains that he did discuss these activities and he was aware of them when he considered her physical symptoms, as the district judge noted. An ALJ need not rehash every detail each time he states conclusions on various subjects. *Rice*, 384 F.3d at 370 n.5; *see also Zellweger v. Saul*, 984 F.3d 1251, 1254 (7th Cir. 2021) ("[N]othing in *Chenery*

prohibits a reviewing court from reviewing an ALJ's step-three determination in light of elaboration and analysis appearing elsewhere in the decision."). She also argues the ALJ failed to consider that she performed tasks slowly, with breaks and help. But an ALJ need not discuss every detail related to every factor, as she admits. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). And the presence of contradictory evidence and arguments does not mean the ALJ's determination is not supported by substantial evidence.

Factor (ii) is "The location, duration, frequency, and intensity of your pain or other symptoms." 20 C.F.R. § 404.1529(c)(3)(ii). Factor (iii) is "Precipitating and aggravating factors." *Id.* at (iii). The ALJ analyzed these factors, too. He acknowledged Gedatus had continued pain and loss of range of motion following her lumbar spine fusion. He acknowledged she had pain in both feet. He determined her back, right knee, and bilateral foot problems were severe impairments. He reviewed her May 2015 report, in which she said she had back and feet pain. He reviewed her October 2015 report, in which she said she could lift 15 to 20 pounds, sit or stand for 30 minutes each, and walk a mile, and she said she had pain in her right wrist, back, hip, legs, and feet. He acknowledged her multiple complaints of pain and other symptoms in his summary of her medical records.

Factor (iv) is medication. *Id.* at (iv). Again, the ALJ considered this. He noted she received injections in 2013 and other medication in November 2015. The ALJ specifically noted that his finding that she had a record of prescribed medication was the reason he gave only "some weight" to the state-agency psychologist's opinion of no mental impairments. Gedatus reported the medication was low dosage with no significant

limitations, so the ALJ found non-severe impairments in this regard. On appeal, she seems to fault the ALJ for not mentioning the medications by name. But no law requires the ALJ to enumerate all the medications. And she faults the ALJ for not evaluating the side effects. But she has given us no reason to think the ALJ's determination was not supported by substantial evidence. According to her own report, the medication was low dosage with no significant limitations.

Factor (v) is treatment other than medication. *Id.* at (v). The ALJ explored this at length.

Factor (vi) is "Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." *Id.* at (vi). The ALJ acknowledged her report in October 2015 that she could sit or stand 30 minutes each with shifting positions, and that she sometimes used a cane. And the ALJ even volunteered an explanation—"if you're sitting in the passenger side you can kind of move about"—for how she could sit for an hour straight during her ride to the hearing despite her testimony that she could not sit for more than 30 minutes. Then he volunteered his observation of her moving in her chair during the hearing.

Factor (vii) is "Other factors concerning your functional limitations and restrictions due to pain or other symptoms." *Id.* at (vii). The ALJ concluded her severe impairments related to her back, right knee, and both feet significantly limited her ability to perform basic work activities. The ALJ evaluated issues regarding her brain aneurysm and depression, and found the impairment to be non-severe.

Gedatus also challenges the ALJ for failing to factor in her "dogged attempts" to continue working despite great pain, supporting her claims' credibility. Again, the face of the ALJ's decision belies her argument, and shows he considered this factor. He noted she worked after the alleged onset but her work did not rise to substantial gainful activity. He recounted her testimony that she worked part-time as a bartender after the alleged onset but had trouble doing the duties. He listed her income over multiple years following the alleged onset.

In sum, we conclude that substantial evidence supports the ALJ's determination.

## 2. Violation of Social Security Ruling 96-8p?

Gedatus argues the ALJ violated the narrative requirements of Social Security Ruling 96-8p by failing to set forth an evaluation of her sitting ability. According to this Ruling: "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996). But the ALJ did not err. He recognized she claimed to have difficulty sitting. And after considering the evidence, he found that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms … ." But he also determined that the evidence did not support her claims about the intensity, persistence, and limiting effects of the alleged symptoms.

A fundamental problem is she offered no opinion from any doctor to set sitting limits, or any other limits, greater than those the ALJ set. *See Rice*, 384 F.3d at 370 ("More importantly, there is no doctor's opinion contained in the record which

indicated greater limitations than those found by the ALJ.") The ALJ gave great weight to the state-agency physicians' opinions that she could perform light work, with certain limits. Indeed, the ALJ assessed *more* limits than any doctor did, because he determined she could not stand or walk for 4 or more hours out of 8[4] and added other limits.

The ALJ gave solid, substantiated reasons for giving more weight to the state-agency physicians' opinions than to Gedatus's claims about the limiting nature of her symptoms. She bears the burden to prove she is disabled by producing medical evidence. *See Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010). Yet she failed to show how her medically determinable impairments caused any limitations beyond those the ALJ found. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not

---

[4] The ALJ's sitting limit is arguably ambiguous. But this is harmless. The state-agency physicians said she could sit 6 of 8 hours. Orally, the ALJ apparently agreed: "I'm going to find that the individual could work at a light exertional level … . And they could sit for up to six hours of an eight-hour workday." But on paper the ALJ did not expressly limit sitting other than light work. The district judge wrote the ALJ limited sitting to 4 hours. Not so. Given the ALJ's oral statement, given no conflict with his writing, and given he relied on the doctors who said she could sit 6, it is reasonable to think the ALJ limited or at least intended to limit sitting to 6. *But see* 20 C.F.R. § 404.953 (requiring ALJ's to issue written decisions and allowing oral decisions only in limited circumstances). The parties seem to disagree. Gedatus argues as if the ALJ did not limit it, but the Commissioner assumes he limited it to 6. But any discrepancy here matters not. She sought a 30-minute limit, which the ALJ rejected with support from substantial evidence. The state-agency physicians said the limit should be 6, and there is no contrary medical opinion. And whether the limit is 6 or full light, the conclusion that she is not disabled abides. The regulations and rulings say full light could be up to 6 of 8 hours standing/walking, leaving 2 to sit.

alone be conclusive evidence of disability … ."); 20 C.F.R. § 404.1529(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled."). He reasonably relied on the state-agency physicians.

She also claims the ALJ erred by failing to assess the functional impact of her tremors. But the ALJ recognized that he needed objective medical evidence to make reasonable conclusions about the intensity, persistence, and effects of her tremors, but this evidence was absent. So, since she has the burden, the ALJ concluded the tremors were not impairments. Besides, she has not pointed to any medical opinion or evidence to show any tremors caused any specific limitations. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) ("[E]ven if the ALJ's RFC assessment were flawed, any error was harmless" because "[i]t is unclear what kinds of work restrictions might address [claimant's] limitations … because he hypothesizes none" and "the medical record does not support any.").

Her other arguments fail and do not need discussion.

## V. Conclusion

Substantial evidence supports the ALJ's decision, and he did not otherwise reversibly err. We affirm.