In the

# United States Court of Appeals

## For the Seventh Circuit

No. 24-1718

JADA M. PADUA,

*Plaintiff-Appellant,*

*v.*

FRANK BISIGNANO, Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:23-cv-01126-PP — **Pamela Pepper**, *Chief Judge.*

ARGUED JANUARY 28, 2025 — DECIDED AUGUST 1, 2025

Before HAMILTON, KIRSCH, and MALDONADO, *Circuit Judges.*

MALDONADO, *Circuit Judge.* Jada Padua applied for Social Security benefits, claiming disability based on several physical and mental conditions, including fibromyalgia, chronic fatigue, depression, and anxiety. After a hearing, an administrative law judge denied her benefits, concluding that Padua was not disabled as defined by the Social Security Act and that jobs existed in significant numbers in the national

economy that Padua could perform. Padua challenged the agency's denial of benefits in federal court, but the district court rejected her petition, holding that the ALJ had substantial evidence to support the decision. We agree with the district court and affirm.

## I.

### A. Medical Treatment History

Padua was forty-five years old when she applied for disability benefits. She holds a high school degree and completed two years of college. Over the years, she has worked in various roles, including as a legal assistant, real estate agent, package handler at a mailing company, receptionist at an insurance company, chiropractor's assistant, and personal assistant. She stopped working in 2008, however, due to symptoms related to multiple medical conditions.

Padua has received treatment from a variety of medical professionals to address her physical and mental impairments. This appeal, though, chiefly concerns the medical opinions of Drs. Robert Carpenter and Anthony Pendolino. Dr. Carpenter, an internist, served as Padua's primary care physician from July 2007 to April 2012. During that same period, Dr. Pendolino, a chiropractor, treated her for fibromyalgia-related pain. Both documented her treatment and provided work-capacity assessments that were central to her disability application.

Padua maintained a regular treatment schedule with Dr. Carpenter from 2007 to 2012, during which he consistently documented her complaints of severe fatigue and widespread pain. He attributed these symptoms to fibromyalgia, chronic fatigue, anxiety, and depression. His physical exams

regularly confirmed fibromyalgia through positive "trigger-point assessments," though her joint range of motion and reflexes generally presented as normal.[1] To manage her symptoms, he prescribed medications including hydrocodone, cyclobenzaprine, Bentyl, and Cymbalta. He also recommended non-pharmaceutical treatments such as water exercises, sauna therapy, and recumbent bicycling, which provided some relief.

Dr. Carpenter's opinion on Padua's work-related limitations shifted over time. In May 2011, he reported significant limitations in bilateral reaching, handling, and fine motor tasks, that she could sit or stand for only 30 minutes at a time, and that she required frequent breaks and position changes. He also observed that pain and medication interfered with her ability to sustain activity beyond 30 minutes and affected her concentration. In December 2011, he further limited her to less than one hour each of sitting and standing/walking per day, prohibited most other postural activities, and restricted her from environmental exposures, driving, and any repetitive or fine motor use of her hands. He also confirmed that fatigue from nine years of sleep disturbances prevented full-time work. Yet in March 2012, Dr. Carpenter switched course, stating that, despite her pain, Padua could work full time in a sedentary position.

In contrast to Dr. Carpenter's evolving opinions, Dr. Pendolino's chiropractic assessments consistently described debilitating fibromyalgia pain. In March 2012, he completed a

---

[1] The trigger-point assessment involves applying pressure to 18 fixed points; sensitivity in at least 11 suggests fibromyalgia. *Swiecichowski v. Dudek*, 133 F.4th 751, 754 n.1 (7th Cir. 2025) (citations omitted).

physical capacities evaluation form indicating that Padua could sit and stand/walk for less than one hour each during an eight-hour workday, needed to alternate positions at will, and was unable to perform even basic tasks with her hands (such as grasping or fine manipulation) or feet (such as repetitive movements). He stated she could never lift even five pounds, perform any postural activities, or tolerate environmental exposure. Unlike Dr. Carpenter, he also found that her pain and medication side effects impaired her attention and concentration to the extent that she could not perform even simple, unskilled work, including full-time sedentary work.

In June 2012, Dr. Pendolino reaffirmed these limitations, describing Padua as in constant pain and discomfort, with disturbed sleep, reduced range of motion, and recent reports of frequent bladder control loss. At an April 2012 visit, he was unable to conduct any treatment due to the severity of her pain. He concluded that Padua was "totally disabled and unable to work in any capacity."

## B. Administrative Proceedings

Padua filed a disability benefits application with the Social Security Administration in November 2010, initially claiming a disability onset date of July 2008, which she later amended to November 2010. In October 2012, an ALJ held a hearing on Padua's application and subsequently issued a decision denying benefits. Padua appealed that decision to federal court, and in February 2016 a magistrate judge remanded the case for further proceedings, finding that the ALJ failed to support the denial of benefits with substantial evidence.

So in early August 2016, the ALJ held a second hearing on Padua's disability benefits application. Represented by

counsel, Padua testified about the ways her impairments interfered with daily activities and her ability to work. She explained that she sometimes fell asleep on her exercise bike after just ten minutes of use. Although she continued to drive, she often had to pull over and sleep, at times barely making it down the block. She also acknowledged, however, that in 2011 she drove twenty miles to attend massage school, which met five days a week for four hours a day over a three-month period. She added that after class, she often slept in her car until she felt rested enough to drive home.

Later that month, the ALJ issued a decision denying Padua's application. Applying the five-step evaluation process established in 20 C.F.R. § 416.920(a)(4), the ALJ determined that Padua was not disabled under the Social Security Act, 42 U.S.C. § 1382c(a)(3). At the first three steps, the ALJ determined that (1) Padua had not engaged in substantial gainful activity since she applied for benefits, (2) her fibromyalgia, chronic fatigue syndrome, depression, and anxiety were severe impairments that limited her ability to work, but (3) that these impairments did not meet a listing for presumptive disability, individually or in combination.

Before step four, the ALJ found that Padua had the residual functional capacity (RFC) to perform "light work" as defined in 20 C.F.R. § 404.1567(b), but with additional physical and mental limitations. Physically, she was limited from climbing ladders, ropes, or scaffolds, to only occasionally climbing ramps or stairs, and from concentrated exposure to hazards such as heights or dangerous moving machinery. Mentally, she was limited to simple instructions, routine and repetitive tasks, simple decision-making, only occasional

changes in the work setting, no interaction with the public, and only occasional interaction with coworkers.

In reaching this RFC, the ALJ discounted Padua's complaints of extreme pain and fatigue, noting that her examinations reflected largely benign findings and that her complaints were inconsistent with her daily activities. The ALJ further highlighted that Padua's symptoms generally responded well to conservative measures such as home exercise and medication.

The ALJ also considered the medical opinions of Drs. Carpenter and Pendolino, four state agency consultants, and two consultative examiners. Although Drs. Carpenter and Pendolino had treated Padua, the ALJ gave their opinions little weight. The ALJ found their conclusion—that Padua was unable to perform full-time work (which varied somewhat in Dr. Carpenter's case)—to be extreme and inconsistent with the overall record.[2] In contrast, she assigned great weight to the opinions of the state agency consultants and the consultative examiners, which she found well supported by the evidence. Nevertheless, the ALJ adopted an RFC more restrictive than those state experts recommended, to Padua's benefit.

Based on this RFC and testimony from the vocational expert, the ALJ determined that Padua could not perform any of her past relevant work (step four), but that jobs existed in

---

[2] In 2016, the agency abided by the so-called "treating physician rule," which directed ALJ's to give controlling weight to the opinions of treating sources if those opinions are well-supported by objective evidence, and they are not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(c)(2). This rule has since been abrogated by the agency, but the parties agree that it still applies to Padua's petition.

significant numbers in the national economy that Padua could perform (step five), such as a housekeeper or cleaner, an office helper, or a mail sorter. Moreover, the ALJ noted that even if she further limited Padua to only sedentary exertional work (with the same non-exertional limitations), several jobs exist in the national economy that Padua could perform, such as a document preparer, a hand packager, or a taper.

Padua exhausted her administrative appeals and then filed this petition for review in federal court, arguing that the ALJ committed several reversible errors. The district court denied her petition, holding that substantial evidence supported the denial of benefits. Padua appeals.

## II.

We review the district court's affirmance of the ALJ's decision de novo, meaning we review the decision of the ALJ directly. *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021). Our review of the agency's decision is deferential. We must uphold it if it rests on "substantial evidence," that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* We examine the entire administrative record but do not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Still, we will not simply "rubber-stamp" the ALJ's decision. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). If the ALJ fails to build an "accurate and logical bridge from the evidence to its conclusion," reversal is warranted. *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (citation modified).

**A. The ALJ's assessment of Padua's fibromyalgia is sup-
ported by substantial evidence**

Padua first challenges the ALJ's decision to discount her
fibromyalgia-related pain, arguing that it led to an erroneous
finding that she could perform some types of light work. She
claims the ALJ overemphasized objective tests and dis-
counted her subjective complaints, while also mischaracteriz-
ing her treatment history and daily activities as inconsistent
with disabling pain.

Padua is right that the Social Security Administration has
recognized that fibromyalgia claims require special care given
the disease's complexity and the key role of subjective evi-
dence in its diagnosis and treatment. *See Hohman v. Kijakazi*,
72 F.4th 248, 252 (7th Cir. 2023). But the ALJ met that complex-
ity head-on. She thoroughly reviewed Padua's long history of
fibromyalgia and her consistent reports of pain to treating
providers, acknowledging the severity of her symptoms. The
ALJ also, as required by law, considered the objective medical
evidence. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R.
§ 404.1529(c)(2) (mandating that the agency obtain and con-
sider objective medical evidence whenever possible). And
that evidence told a different story. Most of Padua's exams—
despite her reported pain—revealed no abnormal findings
apart from the trigger-point assessment. In fact, she generally
performed well on physical exams and consistently appeared
alert and in no acute distress.

Still, the ALJ acknowledged that fibromyalgia does not
typically result in glaringly abnormal medical findings, and
therefore it was hardly surprising that Padua's fibromyalgia
symptoms were not otherwise substantiated by objective
medical evidence. *See Vanprooyen v. Berryhill*, 864 F.3d 567, 572

(7th Cir. 2017) (noting that "trigger-point assessment" is the only recognized test for diagnosing fibromyalgia). So, to resolve the conflict between Padua's subjective complaints and the objective medical evidence, the ALJ considered her treatment history and daily activities. *See Hohman*, 72 F.4th at 252 (citing SSR 12-2P(IV)(B)). The ALJ noted that conservative treatment measures, such as generic medications and home exercise, generally stabilized her fibromyalgia symptoms. *Swiecichowski*, 133 F.4th at 759 ("In some cases, allegations of disabling pain can be discounted when a claimant's treatment consists only of … basic pain management."). The ALJ also highlighted inconsistencies in Padua's reported daily activities. For instance, she claimed that driving down the block was difficult. Yet she also testified to driving twenty miles to massage school five days a week for three months in 2011, where she attended two hours of classroom instruction and two hours of hands-on practice—casting some doubt on her claims of disabling pain.

On this record, the ALJ concluded that while Padua has severe impairments, they do not prevent her from performing certain basic work activities. That conclusion reflects a reasonable assessment of the medical evidence, treatment history, and her daily activities, consistent with agency regulations. Because we may not reweigh the evidence or second-guess the ALJ's well-supported findings, we find no error in the evaluation of Padua's fibromyalgia-related limitations. *See Gedatus*, 994 F.3d at 900.[3]

---

[3] Padua's invocation of *Gebauer v. Saul*, 801 F. App'x 404, 408 (7th Cir. 2020) (unpublished) is of no moment and is not binding authority on this court. *See United States v. Harris*, 124 F.4th 1088, 1092 (7th Cir. 2025). The

**B.  The ALJ's assessment of Drs. Carpenter and Pendolino's opinions is supported by substantial evidence**

Next, Padua contends that the ALJ discounted Drs. Carpenter and Pendolino's opinions without explanation when assessing Padua's RFC.

Starting with Dr. Carpenter, Padua argues that the ALJ erred by failing to assign controlling weight to his December 2011 opinion that her chronic fatigue prevented her from working full-time. According to Padua, the ALJ did not identify any inconsistencies in Dr. Carpenter's medical findings that would justify discrediting his views.

Since Padua filed her claim before 2017, her treating physicians' opinions receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2). An ALJ must provide "good reasons" for giving a treating physician's opinion less than controlling weight. *Id.*; *see Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016). If the ALJ provides adequate reasons for discounting a treating physician's opinions, she need only minimally explain the weight assigned to a medical

---

case is inapposite, too. In that nonprecedential order, we upheld the ALJ's discretionary choice to retain a medical expert in a fibromyalgia case. Padua argues that *Gebauer* required the ALJ to do the same here, but her reading misstates the decision and overlooks the discretion ALJs have in determining whether the record is sufficient. *See* 20 C.F.R. § 404.1513a(b)(2). In this case, the ALJ relied on opinions from Padua's treating physicians, state agency physicians, and consultative examiners, all of which provided a sufficient basis to assess her impairments.

opinion. *See Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024).

The ALJ reasonably gave little weight to Dr. Carpenter's opinion that Padua could not work full-time, citing both internal inconsistencies and contradictions with the longitudinal medical record. Most notably, Dr. Carpenter claimed that Padua's chronic fatigue made full-time work impossible—but just three months later, he said she could sustain full-time sedentary work. In addition, despite Padua's complaints, Dr. Carpenter and other providers consistently described her as "alert and oriented" in clinical visits. *See Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016) (finding that an ALJ properly discounted a treating physician's opinion where the treatment notes documented subjective complaints of pain and fatigue "yet generally reflect[ed] negative findings by the physician after physical examination"). Furthermore, no other physician concluded that Padua's fatigue prevented her from working. Under the regulations, opinions that contradict the medical record as a whole generally deserve less weight. *See* 20 C.F.R. § 404.1527(c)(4).

In addition, the ALJ reasonably discounted Dr. Carpenter's opinions because he is a generalist and not a rheumatologist. Padua's symptoms relate to rheumatologic conditions, and the ALJ sensibly found Dr. Carpenter's opinions less persuasive than those offered by specialists. *See* 20 C.F.R. § 404.1527(c)(5) (stating that opinions of specialists are generally given more weight).

Nor did the ALJ err in evaluating Dr. Pendolino's opinions. A chiropractor is not an "acceptable medical source" under agency regulations, and the ALJ therefore properly declined to afford his opinions controlling weight. *See* 20 C.F.R.

§ 404.1502(a). The ALJ also gave sound additional reasons for discounting Dr. Pendolino's views. One report consisted solely of a checkbox form, where Dr. Pendolino selected the most extreme limitations for every box—stating, for example, that Padua could not even reach above shoulder level. Yet the underlying treatment notes offered no clinical support for these findings. Similarly, although Dr. Pendolino assessed significant limitations in Padua's hand function, his notes reflected neither corresponding physical findings nor any related complaints from Padua herself.

The ALJ adequately assessed the opinions of Drs. Carpenter and Pendolino. Padua's objections boil down to a disagreement with how the evidence was weighed, a determination beyond our review since the ALJ's treatment of these sources was supported by substantial evidence. *See Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022).

## C. The ALJ's RFC determination is supported by substantial evidence

Padua's final challenge is underdeveloped. As best we can tell, she argues that the ALJ underestimated the severity of her limitations in concentration, persistence, and pace, rendering the RFC assessment flawed. More specifically, she contends the ALJ failed to consider the cumulative effect of her impairments over a full workday. But she identifies no specific limitations that the ALJ should have included in the RFC. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (finding any error harmless where the claimant proposes no alternative restrictions). Nor does she identify any specific evidence the ALJ overlooked that would indicate her mild cognitive deficits prevent her from performing simple, routine, or repetitive tasks. *Id.* (citations omitted).

Regardless, we find that the ALJ built the required "accurate and logical bridge" between the record and the conclusion that Padua remains capable of performing a very limited range of light work. Notably, the RFC determination was more restrictive than what any state agency physician recommended—demonstrating the ALJ's careful deliberation. That conclusion, supported by substantial evidence, forecloses her eligibility for disability benefits under our deferential standard of review.

Accordingly, we AFFIRM the judgment of the district court.