In the

# United States Court of Appeals

## For the Seventh Circuit

No. 24-1691

CLAUDETTE ANN RABDEAU,

*Plaintiff-Appellant*,

*v.*

FRANK BISIGNANO, Commissioner of Social Security,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:22-cv-00674-NJ — **Nancy Joseph**, *Magistrate Judge*.

ARGUED DECEMBER 4, 2024 — DECIDED OCTOBER 6, 2025

Before HAMILTON, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges*.

JACKSON-AKIWUMI, *Circuit Judge*. For over a decade, Claudette Rabdeau has sought disability benefits under the Social Security Act for her cervical spine disorder, severe headaches, and mental impairments. The first Administrative Law Judge to hear Rabdeau's case awarded her a partial victory. The ALJ found that she was disabled and entitled to benefits, not dating back to the onset of her symptoms in 2014 as Rabdeau

requested, but dating back to 2018 when her spinal degeneration would have caused her to miss too much work to hold down a job. After Rabdeau appealed, her case was remanded for further consideration. On remand, a second ALJ likewise determined that Rabdeau's disability benefits should begin in 2018. The district court affirmed the decision.

Because the medical record supports the second ALJ's decision, we too must affirm. Contrary to Rabdeau's main argument on appeal, the second ALJ was not obligated to address the prior ALJ's findings so long as the second ALJ produced a decision supported by substantial evidence. That requirement was met here.

## I

### A.  Record Evidence

Rabdeau has been dealing with multiple ailments for more than a decade. A head and spine MRI taken in June 2014 showed that Rabdeau had lower spine arthropathy, muscle atrophy, and a disc protrusion. By November 2014, imaging established that Rabdeau's cervical spine was deteriorating. In December 2014, Rabdeau told doctors she had been getting two to three headaches a week for two years. The headaches were painful, made her sensitive to light and sound, and made performing daily tasks difficult.

Doctors prescribed Rabdeau several pain medications to alleviate her symptoms. These included Oxycodone, morphine, and an anticonvulsant and nerve pain drug called Topamax. But the drugs only decreased the pain in her back; they did not help with her severe headaches. So, in December 2014, Rabdeau sought care from a neurologist, Dr. Fallon Schloemer.

Dr. Schloemer conducted neurological and motor function assessments and found that Rabdeau was alert, attentive, and displayed normal functioning and motor control. Dr. Schloemer appears to have conducted these tests at each of Rabdeau's follow-ups. The results were normal each time. Believing that Rabdeau's headaches likely were exacerbated by the morphine and Oxycodone she was taking, Dr. Schloemer recommended that she stop taking those pain medications and instead take Midrin, a migraine medication.

Rabdeau next visited Dr. Schloemer in February 2015. Her headaches were more frequent by this point—they were occurring daily. She had been unable to stop taking morphine and Oxycodone because her back pain proved unbearable without the drugs. She was also unable to find a pharmacy that carried Midrin. In response, Dr. Schloemer increased Rabdeau's dosage of Topamax, directed her to a pharmacy that carried Midrin, and counseled her again that she needed to stop taking morphine and Oxycodone.

Rabdeau's headaches were less frequent by her next appointment with Dr. Schloemer in March 2015. Rabdeau reported that she experienced headaches lasting four or more hours on at least 15 of the prior 30 days, as opposed to daily. But Rabdeau had been unable to handle the increased Topamax dosage because the side effects were too severe. She was able to tolerate only a slightly elevated dosage. Dr. Schloemer again counseled Rabdeau to stop taking Oxycodone and morphine, and he prescribed Botox injections for the headaches. Five days later, Rabdeau received several of those injections.

Rabdeau's symptoms abated after the Botox injections. By May 2015, the headaches had become more tolerable, she had decreased her Oxycodone intake, and she had maintained her

slightly elevated Topamax dosage. Dr. Schloemer continued the medication regimen and prescribed Rabdeau several more Botox injections over the next year and a half. Dr. Schloemer's notes reflect that the headaches were generally manageable though they fluctuated in severity and frequency.

The remainder of 2015 saw overall improvement. Dr. Schloemer noted at Rabdeau's June 2015 appointment that although Rabdeau had a migraine that lasted a day and a half the prior month, her headaches had "significantly improved" and had decreased in frequency from daily to twice per week. In September 2015, Dr. Schloemer again remarked that Rabdeau's headaches had decreased from daily to twice per week, noting that the headaches were mild, short lived, and did not require acute therapy. Rabdeau's condition remained stable in December 2015.

The year 2016 was much the same. By March 2016, Rabdeau's headaches were only occurring once or twice a month, although their intensity had increased such that they lasted as long as two days. In May 2016, Dr. Schloemer stated that Rabdeau was doing very well and continuing to experience "great relief" from her symptoms. From August 2016 to January 2017, Rabdeau's headaches were still well controlled, though increased stress sometimes aggravated their intensity. Dr. Schloemer did not remark otherwise on the frequency or intensity of the headaches during that five-month gap.

This upward trajectory continued in 2017 and through the early months of 2018. Rabdeau's headaches were well controlled at her May and July 2017 appointments, but the frequency of headaches increased in October 2017. In response, Dr. Schloemer increased Rabdeau's Topamax prescription,

and the issue was resolved by Rabdeau's December 2017 appointment. Rabdeau's headaches were again well controlled in March 2018, though Dr. Schloemer noted that Rabdeau had experienced one severe headache the week before her appointment.

Things changed substantially on May 9, 2018, when Rabdeau visited Dr. Schloemer with acute head and neck pain. Dr. Schloemer noted that Rabdeau's headaches had not been so severe for a long time. He administered a Toradol injection, prescribed a five-day Decadron course, and ordered an MRI of Rabdeau's brain and spine. When Rabdeau returned to Dr. Schloemer on May 22, her symptoms had not lessened at all.

Regrettably, Rabdeau's condition would not improve. Even several consecutive nerve blocks—a procedure during which an anesthetic is injected into nerve endings—would not make the pain tolerable. The pain in Rabdeau's head and spine had become unmanageable and disabling.

## B. Procedural Background

Rabdeau initially applied for disability insurance benefits and supplemental security income in 2015. In her application, she explained that her spinal disorders, severe headaches, and mental impairments made her unable to work and rendered her disabled since June 13, 2014. In April 2018, ALJ Chad Gendreau denied Rabdeau's claim, finding that she was still able to work during the relevant period. After Rabdeau appealed that decision to the district court, the parties entered a joint stipulation remanding the case to the ALJ for further proceedings. In March 2019, the Social Security Administration Appeals Council directed ALJ Gendreau on remand to reconsider the effect that Rabdeau's migraines and mental

impairments had on her ability to work because, according to the Appeals Council, the prior decision did not "adequately evaluate" these issues.

ALJ Gendreau heard the case again in August 2019. An impartial vocational expert testified that an individual who missed more than one day of work per month would be precluded from finding employment. Relying on this testimony, ALJ Gendreau issued a partially favorable decision in December 2019, finding that Rabdeau's headaches had rendered her disabled from May 9, 2018 onwards, but that the headaches were not sufficiently severe from June 13, 2014 to May 8, 2018. As to Rabdeau's residual functional capacity before May 9, 2018, ALJ Gendreau found, among other things, that Rabdeau would have been absent once per month.

Rabdeau appealed the unfavorable portion of the ruling, and the case was remanded once more pursuant to a joint stipulation. The Appeals Council issued another remand order in November 2021. The order stated that ALJ Gendreau had failed to address adequately the evidence in the record showing that Rabdeau reported severe headaches multiple times per week from June 2014 to May 2018 even while receiving care from Dr. Schloemer.

A different ALJ, Gary Freyberg, heard the remanded case. And a different vocational expert testified. The expert stated that any more than "eight absences throughout the year" would be work-preclusive. From his analysis of the record, ALJ Freyberg found that Rabdeau's headaches before May 2018 were not severe enough to render her disabled and denied her claim for pre-May 2018 benefits. The finding that she was disabled as of May 2018 and entitled to benefits remained undisturbed.

ALJ Freyberg explained his decision in a 22-page opinion. After summarizing Rabdeau's medical history, with a particular emphasis on Dr. Schloemer's notes, the ALJ agreed that Rabdeau suffered from severe headaches, degenerative disc disease, and an anxiety disorder during the relevant time. Nevertheless, the ALJ found that none of these impairments were sufficiently severe to entitle Rabdeau to benefits until May 2018. The ALJ specifically observed that all of Dr. Schloemer's notes from March 2015 to May 2018 indicated that Rabdeau displayed normal cognitive and motor functions, and that her headaches generally responded well to the treatment plan. The ALJ also noted the brief instances where Rabdeau's condition worsened slightly and then improved before a subsequent appointment. As to Rabdeau's residual functional capacity, the ALJ found that she was limited to simple light work. The ALJ did not comment on whether or how much Rabdeau's headaches would have caused her to miss work.

Rabdeau appealed ALJ Freyberg's decision to the district court, which affirmed the denial of pre-May 2018 benefits. This appeal followed.

## II

"We will reverse an ALJ's decision only if it is the result of an error of law or it is not supported by substantial evidence." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). The substantial evidence threshold "is not high" and requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is not this court's place to "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's

determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

Rabdeau argues on appeal that ALJ Freyberg was obligated to consider and address ALJ Gendreau's earlier determination that she would have missed one day of work per month. Rabdeau maintains that ALJ Freyberg's failure to consider this evidence alongside the second vocational expert's testimony that more than eight absences in a year was work-preclusive rendered the decision unsupported by substantial evidence.

Rabdeau relies extensively on *Martin v. Saul*, 950 F.3d 369 (7th Cir. 2020), for this argument. Many of *Martin*'s facts parallel Rabdeau's case. Gail Martin alleged that her severe back pain and psychiatric conditions made her unable to work. *Id.* at 371. The first ALJ assigned to her case found that she still had the capacity to perform some sedentary jobs despite having substantial physical impairments. *Id.* A district court vacated and remanded that decision for a "more thorough consideration of Martin's mental health problems." *Id.* On remand, a second ALJ found that Martin had no physical limitations at all and denied Martin's request for benefits. *Id.* Martin then appealed to the district court and again to our court. *Id.* The panel found that the second ALJ's determination was not supported by substantial evidence and awarded Martin benefits. *Id.* at 375–76. In discussing that conclusion, the panel expressed concern that "the second ALJ did not grapple with the first ALJ's findings that Martin could perform only sedentary work," commenting that it "would have expected the second ALJ to explain the basis for reaching such a vastly different conclusion." *Id.* at 376.

Rabdeau reads *Martin* as requiring ALJs to discuss their peers' prior findings in the same case on remand. That reading misinterprets our precedent. Although the failure of the second ALJ in *Martin* to consider the first ALJ's decision was some evidence warranting reversal, the actual issue was the second ALJ's failure to support the denial of benefits with substantial evidence. The *Martin* panel was careful to point out that the second ALJ had ignored a whole cadre of evidence relevant to Martin's physical pain, and had cherry-picked facts supporting a finding of non-disability by "assign[ing] little weight to *every* medical opinion … except for the one provided by … an agency physician who never examined Martin." *Id.* at 375 (emphasis added). Therefore, the second ALJ's silence about the first ALJ's decision was not, as Rabdeau argues, an independent ground warranting reversal in *Martin*. Rather, the problem was that "the evidence f[ell] far from supporting the second ALJ's finding." *Id*.

Accordingly, in Rabdeau's case, we must consider whether ALJ Freyberg's decision is supported by substantial evidence in the record. In assessing this question, we remain mindful that "an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Rabdeau is correct that ALJ Freyberg made no mention of ALJ Gendreau's prior determination about how frequently she might have missed work. But our inquiry does not end there.

We must examine the record. The medical record shows that Rabdeau's headaches generally decreased in frequency and intensity from 2014 to 2018. Although the headaches were more severe at times, those periods were short-lived. Dr.

Schloemer often noted during those higher intensity periods that the symptoms were still well-controlled and that Rabdeau was satisfied with the treatment plan. Importantly, Dr. Schloemer's notes did not consistently recount the actual frequency of Rabdeau's headaches. Instead, the doctor's notes often described only generally that the headaches "somewhat increased in frequency" or were "short lived." ALJ Freyberg grappled with this medical record, noting when Rabdeau's headaches both improved and worsened, and ultimately concluded that "whatever the frequency of the migraines may have been, their severity does not appear to have been disabling."

This record, unlike the one in *Martin*, supports ALJ Freyberg's reasoning and conclusion. The ALJ sufficiently contended with Dr. Schloemer's notes, decided to accord them substantial weight, and ultimately weighed the equivocal record in a way that disfavors Rabdeau, at least for the period before May 2018. Such a decision does not warrant reversal. *See Warnell v. O'Malley*, 97 F.4th 1050, 1054 (7th Cir. 2024) (affirming a denial of benefits where the ALJ sufficiently explained "why the medical record led her to deny [the] claim" by "cit[ing] and describ[ing] discrete examination findings" and "grappl[ing] with conflicting evidence"); *Cf. Winsted v. Berryhill*, 923 F.3d 472, 477 (7th Cir. 2019) (reversing a denial of benefits where the ALJ ignored a vocational expert's testimony about the claimant's most significant work limitations entirely). Therefore, Rabdeau's appeal cannot succeed.

## III

ALJ Freyberg explained why the medical record supported his decision to deny Rabdeau benefits before 2018 and referenced specific evidence pointing both toward and away

from his conclusion. That is sufficient under the "substantial evidence" standard governing our review, so we AFFIRM.